**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**BRACH EICHLER LLC**
Charles X. Gormally, Esq.
101 Eisenhower Parkway
Roseland, New Jersey 07068-1067
(973) 228-5700

*Attorneys for Plaintiffs*

| | |
|---|---|
| **ESTATE OF HERMINE MAUTNER and RICHARD K. MAUTNER,**<br><br>Plaintiffs,<br><br>vs.<br><br>**THE ALVIN H. GLICK IRREVOCABLE GRANTOR TRUST, ALVIN H. GLICK, RANDY E. GLICK, JASON GLICK, 76-77 STREET & THIRD AVENUE LLC and 1329-37 THIRD AVENUE LLC,**<br><br>Defendants. | CIVIL ACTION NO: 1:19-cv-02742 |

**FIRST AMENDED COMPLAINT**

Plaintiffs, Estate of Hermine Mautner and Richard K. Mautner (collectively, "Plaintiffs" or "Mautner family"), by and through their undersigned attorneys, hereby file this First Amended Complaint against Defendants, The Alvin H. Glick Irrevocable Grantor Trust, Alvin H. Glick, Randy E. Glick and Jason Glick (collectively, the "Glick family"), as well as Defendants, 76-77TH Street & Third Avenue LLC ("Buyer") and 1329-37 Third Avenue LLC ("Property LLC") (together with the Glick family, "Defendants"), based upon the following allegations:

## NATURE OF ACTION

1. In this jurisdiction – and in nearly all – partners have a fiduciary duty to treat each other with the "utmost good faith, fairness and loyalty." This case involves a significant and costly breach of this duty by Defendants, who are all members of, or entities controlled by, the Glick family.

2. Members of the Glick family have been business partners with members of the Mautner family for nearly 70 years. During this period, the two families have jointly-owned numerous successful properties together through various single-asset entities.

3. In 2016, however, members and authorized agents of the Glick family made intentional misrepresentations and concealed material facts to fraudulently induce the Mautner family to sell their interest in an entity that owned prime real estate on Manhattan's Upper East Side – while at the same time secretly negotiating a deal to "flip" the property at a substantially higher sales price to one of the largest hospital systems in the State of New York.

4. These secret negotiations began while the Glick family was offering to buy out the Mautner family's interests, and continued through the execution of the purchase agreement, closing and thereafter.

5. As a result of the Glick family's fiduciary violations and fraudulent conduct, they obtained an enormous windfall after "flipping" the property in an approximately $232 million transaction on the heels of securing a favorable purchase agreement the Mautner family – among the largest transactions in New York City in 2018.

6. Based upon publicly available information, the Mautner family estimates that it has suffered damages exceeding $50 million and seeks disgorgement of these ill-gotten gains from Defendants.

7. The Glick family's actions violate the antifraud provisions of the Federal Securities laws, the Securities Exchange Act of 1934, as amended, and further constitute breach of contract, breach of fiduciary duty, fraudulent inducement and unjust enrichment.

## PARTIES

8. Plaintiff, the Estate of Hermine Mautner, was located in the State of Georgia and had a principal address of 2660 Peachtree Road, Apt. 25 A/B, Atlanta, Georgia 30305.

9. Plaintiff, Richard K. Mautner, is an individual who resides in the State of Georgia with a principal address of 2660 Peachtree Road, Apt. 25 A/B, Atlanta, Georgia 30305.

10. Defendant, the Alvin H. Glick Irrevocable Trust, is located in the State of New York with a principal business address of 136 East 57th Street, 14th Floor, New York, New York 10022.

11. Defendant, Alvin H. Glick, is an individual who resides in the State of New York with a principal business address of 136 East 57th Street, 14th Floor, New York, New York 10022.

12. Defendant, Randy E. Glick, is an individual who resides in the State of New York with a principal business address of 136 East 57th Street, 14th Floor, New York, New York 10022.

13. Defendant, Jason Glick, is an individual who resides in the State of New York, with a principal business address of 136 East 57th Street, 14th Floor, New York, New York 10022.

14. Defendant, 76-77th Street & Third Avenue LLC, is a limited liability company formed under the laws of the State of Delaware with a principal business address of 136 East 57th Street, 14th Floor, New York, New York 10022.

15. Defendant, 1329-37 Third Avenue LLC, is a limited liability company formed under the laws of the State of New York with a principal business address of 1345 Third Avenue, New York, New York 10075.

## JURISDICTION

16. Pursuant to 28 U.S.C. § 1332, the United States District Court for the Southern District of New York has subject matter jurisdiction over this action based upon diversity of citizenship because:

(a) Plaintiffs are citizens of the State of Georgia;

(b) Defendants are citizens of the State of New York; and

(c) the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

17. The United States District Court for the Southern District of New York also has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

18. This action arises under Section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, and this Court has subject matter jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa.

19. This Court has supplemental jurisdiction over the common law, non-federal law claims in the action as they arise from the same operative facts as those supporting federal question jurisdiction.

20. In the perpetration of the acts and events that give rise to this action, Defendants, directly and indirectly, used the instrumentalities of interstate commerce, including the United States mail, and telephone and electronic mail communications.

## VENUE

21. Pursuant to Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa and 28 U.S.C. § 1391, venue is proper in the Southern District of New York because Defendants reside in this judicial district; a substantial part of the events and omissions giving rise to the claim occurred here; and the property that is the subject of this action is situated here.

## FACTS COMMON TO ALL COUNTS

### I. Background Facts

22. John Mautner and Alvin H. Glick founded Mautner Glick-Corp. nearly 70 years ago for the purpose of acquiring, owning and managing real estate, with the Mautner family owning 51% and the Glick family owning 49%.

23. John Mautner passed away in 1990. Thereafter, his interests in Mautner-Glick Corp. were transferred to his wife, Hermine Mautner, and the John Mautner Q-Tip Trust, which was established for the benefit of his son, Richard K. Mautner, of which Hermine Mautner was trustee.

24. After John Mautner passed away, the Glick family assumed full operational control over Mautner-Glick Corp., with the Mautner family functioning as passive investors in all new and existing real estate ventures.

25. As passive investors, the Mautner family did not participate in the day-to-day management and operation of the Mautner-Glick Corp. or any of its affiliated entities which were established to hold title to various real estate assets.

26. Richard K. Mautner – the only child of John and Hermine Mautner – is a retired physician and has never had experience in the real estate business other than as a passive investor.

27. As a result, the Mautner family relied entirely on the Glick family with respect to the management and operation of their jointly-held real estate holdings and reasonably depended upon them to act in their best interest. In writing to Randy E. Glick, one of the principals of the Glick family, Marianne Mautner best described the relationship as follows:

> Randy, we want you to know that ever since John died 25 years ago, the Mautner family has always put their FULL trust and confidence in the Glick family's management of our share of the real estate holdings. We have never questioned any decisions you have made on our behalf – believing that you have had the Mautner family interest fully at heart – in line with your own family's interest.

**II. The Property LLC**

28. One of the jointly-held real estate investments was 1329-37 Third Avenue LLC, which was formed by the parties under New York law in 1998 to hold title to the property of the same address located in New York City, which the parties had owned for decades previously. ("Property LLC")

29. The Property LLC was governed by Articles of Organization filed with the Secretary of State of the State of New York and a Limited Liability Company Operating Agreement (the "Operating Agreement"), with each of the three members having the following interests as reflected on Schedule A:

(a) Alvin H. Glick – 50%;

(b) Hermine Mautner – 25%; and

(c) John Mautner Q-Tip Trust – 25%.

30. Under the Operating Agreement, the purpose of the Property LLC was to "possess, manage, insure against loss by fire or other casualties, develop, subdivide, control, partition, improve, preserve, repair, mortgage, lease or otherwise deal with the certain real

property having an address at 1329-37 Third Avenue in the borough of Manhattan and the city, county and state of New York."

31. After formation, the Property LLC acquired additional land on the same block, located at 1339-1341 Third Avenue and 1343-1345 Third Avenue (together with 1329-37 Third Avenue, the "Property").

32. As minority 25% interest-holders, neither Plaintiff had the ability to control the Property LLC.

33. The Operating Agreement makes clear that the Plaintiffs' investment was passive; Section 7.1 provides that "the management of the Company and all decisions concerning the business affairs of the Company shall be made by the Managing Member" and appoints Alvin H. Glick to that role.

34. Section 7.3 further provides that only "the Managing Member and authorized agents of the Company shall have the authority to bind the Company" and grants the Managing Member "the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company."

35. In addition to the fiduciary duties imposed upon a managing member under common law, Paragraph 7.6 of the Operating Agreement provides as follows:

> **Managing Member's Standard of Care**. Each managing member shall discharge the Managing Member's duties to the Company and the others members in good faith and with that degree of care that an ordinarily prudent person in a similar position would use under similar circumstances.

36. Similarly, Section 409(a) of the Limited Liability Company Law of the State of New York provides as follows:

> A manager shall perform is or her duties as a manager, including his or her duties as a member of any class of managers, in good

> faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

37. The Operating Agreement specifies that the Mautner family's interests in the Property LLC are securities under federal and state securities laws, and that those laws apply to the sale of a Member's Units of Membership Interest. Section 11.1 provides: "A member may not transfer (a transfer, for purposes of this Agreement, shall be deemed to include, but not be limited to, any sale, transfer, assignment, pledge, creation of a security interest or other disposition) all or any part of such Member's Units of Membership Interest, except upon compliance with the applicable federal and state securities laws."

38. Hermine Mautner passed away in 2012. Thereafter, the Estate of Hermine Mautner assigned all of her interest in the Property LLC to Richard K. Mautner ("Mr. Mautner"). In addition, the John Mautner Q Tip Trust terminated, resulting in its 25% interest being assigned to Mr. Mautner as beneficiary.

39. On September 1, 2007, Alvin H. Glick assigned his 50% membership interest in the Property LLC to Randy E. Glick (his son), as Trustee of the Alvin H. Glick Irrevocable Grantor Trust (the "Glick Trust").

40. As a result, Randy E. Glick assumed all of Alvin H. Glick's rights and obligations as a member of the Property LLC. However, Alvin H. Glick retained his position as Managing Member of the Property LLC, notwithstanding the assignment of his membership interests.

## III. The Operation Of The Property LLC Until 2016

41. The Glick family managed and operated the Property LLC since the day it was formed. In fact, the management office, operated by the Glick's was located in this property for which the Glick family paid a below market price to the Property LLC for its tenancy.

42. By renting its property to various tenants, the company generated large profits that were distributed to its investors on a regular basis. These distributions provided the Mautner and Glick families with steady – and substantial – income.

43. At various times over the years, the Glick family tried to buy out the Mautner family's interests. They were frustrated that Mr. Mautner – as a passive investor – was benefiting from the Glick family's operation of the company. These negotiations were not fruitful because there was never any meeting of the minds with respect to the value of the ownership interest.

44. During the Glick family's management of the property, they also individually pursued and purchased two additional buildings on the same block without providing notice to their long-time real estate partners: 1347 Third Avenue, New York, New York and 202 East 77th Street, New York, New York (collectively with the Property, the "Block"). These two additional buildings were contiguous corner parcels and resulted in the Glick family having all or partial ownership of the entire city block.

45. Mr. Mautner did not learn of these purchase opportunities until after the transaction closed, and were never given a chance to participate in these investments. The Glick family was under no obligation to offer the Mautner family an opportunity to participate in these other property acquisitions, but its decision to keep them in the dark about their intentions to acquire the surrounding parcels, speaks volumes about events complained of here, which happened years later. Given the location of these two buildings, participating would have both protected and enhanced the value of both the Glick family's and the Mautner family's ownership interests in the Property LLC.

**IV. The Glick Family Engages In A Fraudulent Scheme To Coerce Mr. Mautner To Sell His Interests In The Property LLC**

46. Over the next several years, the Glick family engaged in a deliberate, calculated and fraudulent scheme to induce Mr. Mautner to sell his interests in the Property LLC.

47. After securing the surrounding properties, the Glick family advised Mr. Mautner that they intended to pursue a substantial development project involving the entire Block – *i.e.* the properties jointly-held by the parties as well as the properties individually-owned by the Glick family.

48. When they initially discussed these plans with Mr. Mautner, the Glick family advised that they were in negotiations with Related Companies ("Related"), an experienced and well-known real estate developer, to invest in and manage the development of the project.

49. According to the Glick family, the development would be a mixed-use project consisting of retail, a community health facility and residential units. And Related had already identified a tenant for the community health facility – Northwell Health.

50. In response to this information from the Glick family, Mr. Mautner indicated that his preference would be to either leave the property as is and continue to enjoy the distributions he was receiving, or expose the entire Block to the market for a sale.

51. The Glick family, however, specifically advised that they would not agree to sell the entire Block or expose it to the market for sale; rather, they wanted to move forward with a development project for the entire Block.

52. Based upon these representations and the limited options available to them, Mr. Mautner advised the Glick family that he would cooperate with the Block project that was outlined by the Glicks and involved Related – an experienced developer of property in New York City.

53. Shortly thereafter, the Glick family advised Mr. Mautner that Related had pulled out of the negotiations and would not be proceeding.

54. At that point, Mr. Mautner asked the Glick family – Alvin H. Glick and Randy E. Glick – whether Northwell Health was still interested in leasing all or part of the Block.

55. The Glick family specifically represented, in the presence of counsel, that Northwell Health was also out of the deal and that they were no longer negotiating.

56. Disappointed, Mr. Mautner reiterated his interest in either continuing his ownership and resulting distributions generated at the property, or exposing the entire Block for sale to the highest offer.

57. However, the Glick family specifically represented that they intended to develop the Block on their own – a drastic departure from the type of real estate work that the two families had engaged in since the inception of the Mautner-Glick Corp.

58. In fact, the Glick family – whether individually or together with the Mautner family – had never engaged in a development project of any meaningful size, let alone one with the complexity and expertise required to develop a high rise property in New York City.

59. The Glick family also specifically represented, once again, that they had absolutely no interest in an outright sale of the Block including the real estate owned by the Property LLC ; or exposing it to the market to determine its potential value.

60. This chain of events caused Mr. Mautner to become reasonably and rightfully concerned about his passive investment in the Property LLC. And he expressed these concerns to the Glick family.

61. The Glick family seized on these concerns as a basis to resurrect buyout negotiations with respect to the Property LLC.

62. In the process, the Glick family misrepresented or failed to disclose critically important facts about the Block project: (a) that the Glick family, in fact, ***was considering an outright sale of the entire Block***; and (b) that Related had, in fact, ***advised them that Northwell Health was still interested in the project and would be contacting them directly***.

63. These material facts and omissions affected Mr. Mautner's (or any investor's) decision to sell, as they directly impacted the value of his continued investment in the Property LLC and the viability of the Glick family's redevelopment plans.

64. Based upon this perverse state of facts – under which the Glick family represented that it would not sell; that it would be undertaking a large-scale development project far outside of its expertise; and by failing to disclose that the tenant identified by Related was still interested in pursuing the project – negotiations recommenced in 2016 with the goal of achieving a buyout of Mr. Mautner's interests in the Property LLC at a highly advantageous price.

65. The negotiations moved slowly. By July 2016, the pace of negotiations began to frustrate the Glick family, in particular Alvin H. Glick, as reflected in various emails between the parties.

66. This led to the Glick family engaging in coercive measures aimed at forcing the Mr. Mautner's hand.

67. On July 21, 2016, Kenneth Kandel, Controller of Mautner-Glick Corp., sent an email to Mr. Mautner advising that the company would be exercising the cancellation clauses in existing tenant leases to begin the process of vacating the Property for the development project.

68. In addition, Mr. Kandel advised that the company would be "stopping the draw entirely no later than September 1, 2016 in order to have enough funds available" to operate the Property while it was vacant.

69. Said differently, Mr. Kandel advised that the company would no longer be paying Mr. Mautner distributions from the Property LLC – totaling approximately $1,000,000 per year – as a result of the Glick family's development plans.

70. Thereafter, on July 27, 2016, Randy E. Glick sent a similar email to Mr. Mautner advising, once again, of the commercial lease buyouts and the suspension of the distribution payments.

71. In this email, Randy E. Glick also advised that Alvin H. Glick, the Managing Member, "will not accept any further delays" in their buyout negotiations and would involve a "joint venture partner" – without Mr. Mautner's approval – if a deal was not reached promptly. The latter was an option Mr. Mautner had specifically and repeatedly rejected.

72. The Glick family engaged in all of these actions – surreptitiously purchasing the surrounding real estate, claiming that it planned to develop the entire Block on their own, misrepresenting Northwell Health's continued interest in the project, failing to disclose that Northwell Health was still actively pursuing the project, canceling tenant leases, representing that the Glick family would never sell its interest in the Block property, suspending distribution payments and threatening to bring in a joint-venture partner – for the sole purpose of misleading, inducing and coercing Mr. Mautner to sell his interests in the Property LLC so that it could financially benefit from its sale.

73. In reality, the Glick family never had any intention of developing the Block themselves, despite their repeated representations to the contrary.

74. Nor did the Glick family ever intend to engage any joint-venture partners for their proposed development project. They only made this threat because they knew (a) Mr. Mautner,

as a passive investor, did not feel comfortable doing business with unknown third parties; and (b) this threat could push Mr. Mautner closer to selling his interests in the Property LLC.

75. The Glick family then acted on its threats, exercising the cancelation clauses in tenant leases and depriving Mr. Mautner of the substantial distributions he was receiving from the Property LLC. They took this action for only one reason: to create more pressure on Mr. Mautner to sell his interests in the Property LLC.

## V. As A Result Of The Glick Family's Fraudulent And Coercive Actions, Mr. Mautner Agrees To Sell His Interests In The Property LLC

76. The Glick family's fraudulent scheme, as outlined above, left Mr. Mautner with no choice but to move ahead to negotiate a buyout of his interests in the Property LLC.

77. These negotiations commenced in August of 2016 and continued through the next few months, with the parties agreeing upon all material terms in November 2016.

78. On November 18, 2016, the parties entered into and executed an Agreement of Purchase and Sale of Membership Interests ("Purchase Agreement"), under which Plaintiffs agreed to sell their interests in the Property LLC to a newly-created entity – 76-77TH Street & Third Avenue LLC, an entity owned and controlled by the Glick family. The purchase priced totaled $44,000,000.00.

79. At or near the time the Purchase Agreement was executed, the Glick family sent an email to Mr. Mautner requesting that the closing of the transaction take place in March of 2017 to ensure that they had sufficient time to secure financing. Mr. Mautner agreed.

## VI. The Glick Family Fraudulently Conceals A Proposed Transaction For The Property That Occurred Before Closing, In Violation Of Their Fiduciary Duties

80. At this point – in November 2016 – the full extent of the Glick family's unlawful conduct had not come to light.

81. Unbeknownst to Mr. Mautner, throughout the time period leading up to and during these buyout negotiations, the Glick family was secretly planning to "flip" the Block once it secured full ownership of the Property LLC.

82. Not surprisingly, the proposed buyer was the community health center tenant previously identified by Related – Northwell Health.

83. According to its website, Northwell Health is the State of New York's largest health care provider and private employer, with 23 hospitals, nearly 700 outpatient facilities and approximately 3,300 physicians.

84. So both before and after the execution of the Purchase Agreement, the Glick family engaged in discussions with the largest health care provider and private employer in the State of New York regarding a transaction involving the Block, yet never disclosed this highly material information to Mr. Mautner.

85. The evidence of these secret negotiations is clear and direct. Indeed, in an email dated January 6, 2017 – before Mr. Mautner closed the transaction to sell his member interests to the Glick family – Joel E. Papo, the Vice President of Real Estate Strategy for Northwell Health, sent a Letter of Intent ("LOI") to Jason Glick seeking a 99-year lease of the Block at a rental amount totaling $6,000,000.00 per year plus periodic future increases.

86. Notwithstanding that Mr. Mautner was still a 50% member in the Property LLC on January 6, 2017, the Glick family never provided him with a copy of the LOI, nor did they otherwise advise him of the proposed transaction.

87. Instead, shortly after receiving the LOI, the Glick family contacted Mr. Mautner by email dated January 10, 2017, asking for the closing date of the buyout to be moved up to January 26, 2017 – even though they had previously asked for a closing date in March of 2017.

88. Almost any real estate investor – even those who are unsophisticated – understands that a 99-year lease is a tax-favored method used to acquire real estate, akin to a purchase, and often a prelude to an even more robust discussion of an outright purchase.

89. In other words, the Glick family surely knew that if Northwell Health was interested in pursuing a 99-year lease, it could potentially make an offer to purchase the Block outright.

90. This information was material to the transaction in which the Glick family was acquiring Mr. Mautner's interests; any investor would have considered the LOI an important fact impacting both a decision to sell and the value of a potential sale.

91. Nevertheless, the Glick family concealed the LOI and all other negotiations with Northwell Health from Mr. Mautner.

92. Simply put, as of the date of the LOI, Mr. Mautner was still a member of the Property LLC; Alvin H. Glick was still the Managing Member of the Property LLC; both he and Randy E. Glick continued to owe a fiduciary duty to Mr. Mautner; and thus they had a duty to disclose the contents of any discussions regarding a potential transaction with Northwell Health, including the LOI.

93. The Purchase Agreement transaction between the parties closed on January 26, 2017, without the Glick family ever disclosing any of this material information.

94. Mr. Mautner also came to learn, after the fact, that the Glick family's financing for this transaction involved securing a one year "bridge" loan in the amount of the purchase price.

95. Typically, to obtain a "bridge" loan, the borrower is required to demonstrate to the lender the source of repayment – *e.g.* the resale of the property or security – since the loan term tends to be short in duration.

96. And this is particularly true where, as here, the Glick family had begun canceling all of the Property LLC's tenant leases, thus eliminating all of its cash flow.

97. This further demonstrates that the Glick family had another deal in its "back pocket" prior to and at the time it closed the Purchase Agreement transaction with Mr. Mautner.

## VI. The Glick Family Flips The Block To Northwell Health And Obtains A Windfall, To The Substantial Detriment Of Mr. Mautner

98. Shortly after closing, the Glick family received a second LOI from Northwell Heath for the outright purchase of the Block, totaling $225,000,000.00.

99. At the same time, the Glick family secured the services of a commercial real estate broker to assist with the transaction.

100. Upon information and belief, the Glick family entered into a contract with Northwell Health ("Northwell Transaction") to sell the Block sometime after they closed the Purchase Agreement transaction with Mr. Mautner.

101. The Glick family's sale of the Block to Northwell Health closed in August 2018 for total consideration of $232,000,000.00, and was one of the five largest real estate transactions in New York City in 2018.

102. Mr. Mautner, through his agents and representatives, first learned that the Glick family was in advanced negotiations to sell the Block to Northwell Health on or about September 7, 2017, from publicly-available real estate news sources and websites.

103. Mr. Mautner, through his agents and representatives, first learned that the Northwell Transaction closed, and the terms of the deal, on or about August 6, 2018, from publicly-available real estate news sources and websites.

**COUNT I**

**(Violation Of The Securities Exchange Act Of 1934)**

**(Against All Defendants)**

104. Plaintiffs repeat the allegations contained Paragraphs 1 to 103 above and incorporate them by reference as if fully set forth herein at length.

105. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [United States Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 78j(b).

106. Rule 10b-5, promulgated by the Securities and Exchange Commission pursuant to Section 10(b) provides that it is unlawful, "in connection with the purchase or sale of any security," "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5.

107. Defendants have violated Section 10(b) of the Securities Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, by engaging in schemes, conspiracies and a course of conduct, to knowingly or with conscious recklessness operate a fraud and deceit upon Plaintiffs.

108. Defendants made representations to Plaintiffs, as stated in this First Amended Complaint, in order to manipulate, use as a deceptive devise, and defraud Plaintiffs into selling their securities to Defendants.

109. Defendants have also violated Section 10(b) of the Securities Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, because they disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

110. Plaintiffs have suffered damages as the direct and proximate result of this fraudulent activity, because they have been deprived of any ownership interest in the securities at issue (namely the membership interests in the Property LLC) and are being denied the resulting benefits. The amount of such damages shall be determined at the time of trial.

## COUNT II

## Breach Of Contract

## (Against The Glick Defendants And Glick Trust)

111. Plaintiffs repeat the allegations contained Paragraphs 1 to 110 above and incorporate them by reference as if fully set forth herein at length.

112. The Operating Agreement of the Property LLC is a valid and binding contract entered into and executed by the relevant parties.

113. Paragraph 7.1 of the Operating Agreement designated Alvin H. Glick as Managing Member of the Property LLC.

114. Paragraph 7.6 of the Operating Agreement required the Managing Member to discharge his or her “duties to the company and the other members in good faith and with that

degree of care that an ordinarily prudent person in a similar position would use under similar circumstances."

115. On September 1, 2007, Alvin H. Glick assigned to Randy E. Glick, as Trustee of the Glick Trust, his 50% membership interest in the Property LLC.

116. As a result, Randy E. Glick assumed all of Alvin H. Glick's rights and obligations as a member of the Property LLC.

117. However, Alvin H. Glick retained his position as Managing Member of the Property LLC, notwithstanding the assignment of his membership interests.

118. By engaging in the aforementioned conduct, Alvin H. Glick, the Glick Trust and/or Randy E. Glick breached Paragraph 7.6 of the Operating Agreement.

119. As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

**COUNT III**

**Breach Of Fiduciary Duty And Duty Of Loyalty**

**(Against The Glick Defendants And Glick Trust)**

120. Plaintiffs repeat the allegations contained Paragraphs 1 to 119 above and incorporate them by reference as if fully set forth herein at length.

121. At all relevant times, Plaintiffs were members in the Property LLC.

122. At all relevant times, the Glick Trust, by and through its Trustee, Randy E. Glick, was a member of the Property LLC.

123. At all relevant times, Alvin H. Glick served as the Managing Member of the Property LLC, notwithstanding the assignment of his membership interests to the Glick Trust and its Trustee, Randy E. Glick.

124. As a Managing Member of the Property LLC, Alvin H. Glick owed a fiduciary duty and duty of loyalty to Plaintiffs at common law.

125. As a member of the Property LLC, the Glick Trust and its Trustee, Randy E. Glick, owed a fiduciary duty and duty of loyalty to Plaintiffs at common law.

126. By engaging in the aforementioned conduct, Alvin H. Glick, the Glick Trust and Randy E. Glick have breached their fiduciary duty and duty of loyalty to Plaintiffs.

127. As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

**COUNT IV**

**Common Law Fraud – Inducement, Omission And Concealment**

**(Against All Defendants)**

128. Plaintiffs repeat the allegations contained Paragraphs 1 to 127 above and incorporate them by reference as if fully set forth herein at length.

129. Defendants made material and intentional misrepresentations regarding the Property LLC and the development of the Block project for the sole purpose of inducing Plaintiffs to sell their interests.

130. These material and intentional misrepresentations include Defendants advising Plaintiffs that:

(a) they were planning to the develop the Block project on their own; and

(b) had absolutely no interest in selling any part of the Block, including the real estate owned by the Property LLC.

131. Plaintiffs reasonably relied upon these material misrepresentations when entering into the Agreement to sell their interests in the Property LLC.

132. In addition, Defendants willfully, purposely and knowingly concealed material information regarding the Properly LLC and the development of the Block project.

133. These material omissions include failing to disclose to Plaintiffs that:

(a) Northwell Health – the tenant identified by Related – was still pursuing the Block project even after Related pulled out of the negotiations; and

(b) Northwell Health had submitted an LOI for a 99-year lease of the Property LLC.

134. Defendants concealed this material information for the sole purpose of deceiving Plaintiffs and ensuring that proceeded with the sale of their interests in the Property LLC.

135. Defendants engaged in this pattern of fraudulent conduct fully intending that Plaintiffs – their long-time partners and passive investors – would rely upon them, as they had for decades since John Mautner passed away.

136. As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

**<u>COUNT V</u>**

**(Unjust Enrichment Against All Defendants)**

137. Plaintiffs repeat the allegations contained Paragraphs 1 to 136 above and incorporate them by reference as if fully set forth herein at length.

138. By deceiving Plaintiffs into selling their interests in the Property LLC, Defendants unlawfully obtained a substantial windfall.

139. Specifically, Defendants "flipped" their interests in the Property LLC and the Block and retained all of this ill-gotten gain.

140. For all of the reasons alleged above, the retention of these monies by Defendants is unjust.

141. As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

**BRACH EICHLER LLC**
*Attorneys for Plaintiff*

*/s/ Charles X. Gormally, Esq.*
Charles X. Gormally, Esq.

Dated: April 5, 2019

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury.

## CERTIFICATION OF RELATED ACTIONS

I certify that the foregoing matter in controversy is not the subject of any other pending lawsuit, arbitration or administrative proceeding, nor is any other such lawsuit or arbitration proceeding presently contemplated.

I understand that if any of the foregoing statements made by me are willfully false, I may be subject to punishment.

**BRACH EICHLER LLC**
*Attorneys for Plaintiffs*

*/s/ Charles X. Gormally, Esq.*
Charles X. Gormally, Esq.

Dated: April 5, 2019