UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
ESTATE OF HERMINE MAUTNER and RICHARD
K. MAUTNER,

               Plaintiffs,

      - against -

THE ALVIN H. GLICK IRREVOCABLE GRANTOR
TRUST, ALVIN H. GLICK, RANDY E. GLICK,
JASON GLICK, 76-77 STREET & THIRD AVENUE
LLC, and 1329-37 THIRD AVENUE LLC,

               Defendants.
------------------------------------X

**MEMORANDUM & ORDER**

19 Civ. 2742 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


The Alvin H. Glick Irrevocable Grantor Trust, Alvin H. Glick, Randy E. Glick, Jason Glick, 76-77 Street & Third Avenue LLC, and 1329-37 Third Avenue LLC (collectively, "defendants") move to dismiss the amended complaint of Richard K. Mautner and the Estate of Hermine Mautner (together, "plaintiffs"). The Court grants defendants' motion for the reasons stated herein.

## I. BACKGROUND

John Mautner and Alvin H. Glick founded Mautner-Glick Corp., a real estate investment and management business, more than sixty years ago. Am. Compl. ("FAC") ¶ 22. When John passed away in 1990, his interest in Mautner-Glick transferred to his wife, Hermine Mautner, and to the John Mautner Q-Tip Trust, the sole beneficiary of which was his and Hermine's only child, Richard K.

Mautner. FAC ¶¶ 23, 26. "The Glick family," which the amended complaint defines as The Alvin H. Glick Irrevocable Grantor Trust ("Alvin's Trust"), Alvin, Randy E. Glick, and Jason Glick, FAC at 1, oversaw Mautner-Glick's day-to-day operations following John's death, FAC ¶ 24.

In 1998, the parties formed 1329-37 Third Avenue LLC (the "Property LLC") to hold title to the property of the same address in New York City. FAC ¶ 28. A Limited Liability Company Operating Agreement (the "Operating Agreement") governed the Property LLC. See Declaration of Robert F. Serio ("Serio Decl."), Ex. B ("OA"). It appointed Alvin as the "Managing Member," and, as such, gave him authority to manage the operations and administration of the business. See OA § 7. However, it required the unanimous consent of the Property LLC's members for certain decisions, including, among other things, selling property outside the ordinary course of business, borrowing money, mortgaging property, amending the Operating Agreement, admitting new members, and compensating the Managing Member. See OA § 6. After its formation, the Property LLC acquired title to 1339-1341 and 1343-1345 Third Avenue (together, with 1329-37 Third Avenue, the "Property"). FAC ¶ 31. The Property LLC generated profits by leasing the Property, and distributed its profits to members regularly. FAC ¶ 42.

When the Property LLC was formed, its members were Alvin, who owned 50% of the membership units, and Hermine and the John Mautner Q-Tip Trust, each of which owned 25% of the units. OA, Sched. A. However, Alvin later assigned his membership units to his son, Randy, in Randy's capacity as Trustee of Alvin's Trust. FAC ¶ 39. He nonetheless continued as the Property LLC's Managing Member. FAC ¶ 40. Moreover, in 2012, Hermine passed away and the Estate of Hermine Mautner (the "Estate") "assigned all of [its] interest in the Property LLC to Richard." FAC ¶ 38. The John Mautner Q-Tip Trust also terminated and its interest in the Property LLC transferred to Richard. FAC ¶ 38.

An unspecified time after the parties formed the Property LLC, the Glick family purchased 1347 Third Avenue and 202 East 77th Street (together with the Property, the "Block"), which resulted in the Glick family's full or partial ownership of each property on the east side of Third Avenue between 76th and 77th Streets. FAC ¶¶ 44-45.

"[Y]ears later," the Glick family became interested in developing the Block, and approached Richard about doing so. FAC ¶¶ 45, 47. They explained that The Related Companies, L.P. ("Related"), an experienced real estate developer, was interested in investing in and managing the development, and that the development would be a mixed-use project consisting of retail

storefronts, residential apartments, and a community health facility. FAC ¶ 47-49. Moreover, Related had identified Northwell Health ("Northwell") as a potential tenant for the community health facility. FAC ¶ 49. Richard opposed developing the Block, and expressed his preference instead to continue leasing its properties or to market the Block for a sale. FAC ¶ 50. However, after further discussions, Richard agreed to cooperate with the development. Compl. ¶¶ 51-52.

Shortly thereafter, Related withdrew from the project. FAC ¶ 53. When the Glick family notified Richard of Related's withdrawal, Richard inquired about Northwell's continued participation in the development. FAC ¶ 54. After the Glick family told him that Northwell was also not partaking in the deal, Richard reaffirmed his desire to leave the Block as it was or to sell it. FAC ¶ 56. The Glick family still wanted to develop the Block, though, even without an experienced development partner such as Related. FAC ¶ 57. Richard objected, however, because he and the Glick family "had never engaged in a development project . . . with the complexity and expertise required to develop a high[-]rise property in New York City." FAC ¶¶ 57-58.

The parties accordingly commenced negotiations for the Glick family to purchase Richard's interest in the Property LLC so that the Glick family could pursue developing the Block. FAC ¶¶ 60-

61, 64.  Although negotiations began in early 2016 at the latest, they "moved slowly."  FAC ¶¶ 64-65.

In July 2016, Kenneth Kandel, Controller of Mautner-Glick Corp., emailed Richard to inform him that Mautner-Glick was going to cancel the Block's leases and cease monthly draws by September 1 in order to "vacat[e] the Property for the development project" and "to have enough funds available to operate the Property while it was vacant."  FAC ¶ 65, 67-68 (internal quotation marks omitted).  After receiving Kandel's email, Richard and his wife emailed Randy on July 26 to complain that although Randy "had assured [them] that the monthly payments would be decreased as the tenants were terminated," Kandel's email contemplated a sudden cessation of payments.  Declaration of Charles X. Gormally ("Gormally Decl."), Ex. A.  "Richard d[id] not fully understand the change of plan" and demanded that Randy "furnish a schedule of all current leases with rental amounts and terms of each lease." Gormally Decl., Ex. A.

Randy replied the next day, and explained that suspending the draw was necessary to accumulate funds to buy out the Block's commercial leases ahead of a development.  Serio Decl., Ex. C at 1.  He also reminded Richard that the information he requested was part of the Property LLC's monthly management statements that Richard received.  Serio Decl., Ex. C at 1.  Finally, Randy stated

his preference that Richard and the Glick family remain partners going forward, but noted that Alvin "ha[d] grown very frustrated and impatient with the outcome of our negotiations in the past, when deals with Richard on a buyout were made and subsequently rejected," as well as with "the slow pace of our current negotiations for a fair and reasonable deal[.]" Serio Decl., Ex. C at 1.

Two days later, Richard emailed Randy to notify him that Richard had retained real estate attorney Alan Hammer to represent him and "speak[] completely on [his] behalf" throughout the buyout negotiations. See Declaration of Esther Lifshitz ("Lifshitz Decl."), Ex. 1. Hammer was a real estate "lawyer who ha[d] extensive experience both in NY and NJ." Id.

Negotiations continued through the fall and, on November 18, 2016, Richard executed an Agreement of Purchase and Sale of Membership Interests (the "Buyout Agreement") with 76-77 Street & Third Avenue LLC (the "Buyout LLC"), a Delaware limited liability company "owned and controlled by the Glick family," FAC ¶ 78, to sell his interest in the Property LLC for $45 million, Serio Decl., Ex. D ("BA") § 2.2. The Buyout Agreement contained no representations or warranties concerning negotiations, offers, or the like for any of the Block's properties. It required Richard

to deliver an Assignment and Assumption Agreement (the "Assignment Agreement") to the Buyout LLC at closing. BA §§ 5.1.1, 5.3.1.

On January 6, 2017, a representative of Northwell emailed Jason "seeking a 99-year lease of the Block." FAC ¶ 85. In response, the Glick family emailed Richard and asked to move the date on which its purchase of his interest in Property LLC would close from March to January 2017. FAC ¶ 87. Richard agreed, and the sale closed on January 26, 2017. FAC ¶ 93. At the closing, Richard delivered the executed Assignment Agreement, which contained a mutual release of claims, Serio Decl., Ex. E ("AA") §§ 3, 4. Richard "forever release[d] and discharge[d] [the Buyout LLC] and its affiliates, officers, directors, agents and employees . . . from any and all . . . claims . . . of any type of kind whatsoever, whether known or unknown . . . in connection with" his interest in the Property LLC. AA § 3 (the "Release"). New York law governed the Assignment Agreement's terms. AA § 12.

An unspecified time later in 2017, the Glick family received an offer to purchase the Block from Northwell Health. FAC ¶ 98. On September 7, 2017, Richard learned that the Glick family was in negotiations to sell the Block to Northwell. FAC ¶ 102. The Glick family and Northwell later agreed to a sale of the Block, which closed in August 2018 for $232 million. FAC ¶ 101.

Plaintiffs filed a complaint against defendants in March 2019, amending it the next month. The amended complaint alleged that after the initial deal with Related fell through, the Glick family entered secret negotiations with Northwell to sell the Block, and, in order to avoid sharing the profits from any such sale with Richard, defrauded him into selling his interest in the Property LLC to them. Based on this theory, the amended complaint asserted a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. It also asserted claims for breach of contract, breach of fiduciary duty, common law fraud, and unjust enrichment arising from Richard's sale of his interests in the Property LLC. Before the Court is defendants' motion to dismiss plaintiffs' amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(6).

## II. DISCUSSION

### A. Pleading Standard

The Court may dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "'To survive a motion to dismiss'" on this basis, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" In re Terrorist Attacks on September 11, 2001, 714 F.3d 118, 122 (2d Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "'A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 678).

**B. Preliminary Matters**

Before the Court determines whether plaintiffs' complaint states a claim, it addresses two preliminary matters. First, the Court dismisses plaintiffs' claim for unjust enrichment because their opposition brief consents to its dismissal. Pls.' Opp. ("Opp.") at 20 n.14.

Second, the Court addresses whether the Estate has standing to assert its claims. "Whether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit." <u>Fair Hous. in Huntington Comm. Inc. v. Town of Huntington</u>, 316 F.3d 357, 361 (2d Cir. 2003). Standing requires each plaintiff to "have suffered an 'injury in fact' – an invasion of a legally protected interest which is . . . particularized . . . ." <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct. 1540, 1548 (2016). This means the plaintiff "'personally has suffered some actual or threatened injury.'" <u>Id.</u> (quoting <u>Valley Forge Christian Coll. v. Am. United</u>

for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982)).

The injury on which plaintiffs base their claims, however, is the loss of the difference between the $45 million that the Buyout LLC paid Richard for his 50% interest in the Property LLC, and what Richard would have received for that interest if he had sold it as part of Northwell's August 2018 purchase of the Block. That was not an injury to the Estate because it had "assigned all of [its] interest in the Property LLC," FAC ¶ 38, to Richard years before the sale, see, Amusement Indus., Inc. v. Stern, No. 07-CV-11586 (LAK), 2011 WL 6811018, at *4 (S.D.N.Y. Dec. 28, 2011) ("Having assigned any 'right' or 'interest' it had in the payments made pursuant to the Contract . . . [plaintiff] plainly lack[ed] standing to initiate a new law suit for return of those payments."); Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n, 731 F.2d 112, 125 (2d Cir. 1984) ("An unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor."). Accordingly, the Court finds that the Estate lacks standing to assert its claims.

**B. Plaintiffs' Common Law Claims**

Defendants contend that the Release bars plaintiffs' common law claims.[1]  "Generally, a valid release constitutes a complete bar to an action on a claim which is the subject of the release." Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V., 952 N.E.2d 995, 1000 (N.Y. 2011) ("Centro II") (internal quotation marks omitted).  "Notably, a release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is 'fairly and knowingly made.'" Id. (quoting Mangini v. McClurg, 249 N.E.2d 386, 392-93 (1969)).  Indeed, "a release that, by its terms, extinguishes liability on any and all claims arising in connection with specified matters is deemed to encompass claims of fraud relating to those matters, even if the release does not specifically refer to fraud and was not granted in settlement of an actually asserted fraud claim." Centro Empresarial Cempresa S.A. v. American Movil, S.A.B. de CV, 901 N.Y.S.2d 618, 625 (N.Y. App. Div., 1st Dep't 2010) ("Centro I"), aff'd, 952 N.E.2d 995 (N.Y. 2011).

Although the defendant bears the initial burden of demonstrating that a contract released it from any claims, an

---

[1] Defendants also contend that the Release bars plaintiffs' securities fraud claim.  The Court declines to address that issue given plaintiffs' failure to plead that Richard's membership interests in the Property LLC were securities under the federal securities laws.  See infra § II.C.

executed release shifts the burden to the plaintiff to establish that the release was invalid because of "'duress, illegality, fraud, or mutual mistake.'" Centro II, 952 N.E.2d at 1000 (quoting Mangini, 249 N.E.2d at 390). A plaintiff may invalidate a release for fraud, however, "only if it can identify a separate fraud from the subject of the release." Id. In other words, if "[t]he fraud described in the complaint . . . falls squarely within the scope of the release," then that fraud cannot nullify the release. See id. at 1001. "Were this not the case, no party could ever [release] a fraud claim with any finality." Id.

"A sophisticated principal is able to release its fiduciary from claims – at least where . . . the fiduciary relationship is no longer one of unquestioning trust – so long as the principal understands that the fiduciary is acting in its own interest and the release is knowingly entered into." Centro II, 952 N.E.2d at 1001. "Where a principal and fiduciary are sophisticated parties engaged in negotiations to terminate their relationship, however, the principal cannot blindly trust the fiduciary's assertions." Id. at 1002. "The test, in essence, is whether, given the nature of the parties' relationship at the time of release, the principal is aware of information about the fiduciary that would make reliance on the fiduciary unreasonable." Pappas v. Tzolis, 982 N.E.2d 576, 579 (N.Y. 2012).

Richard "forever release[d] and discharge[d] [the Buyout LLC] and its affiliates, officers, directors, agents and employees . . . from any and all . . . claims . . . of any type or kind whatsoever, whether known or unknown . . . in connection with" his interest in the Property LLC. AA § 3. The Release accordingly bars plaintiffs' common law claims unless plaintiffs demonstrate that the Release was plausibly invalid. See Centro II, 952 N.E.2d at 1000.[2]

Plaintiffs have failed to so demonstrate. They nowhere argue that the Release is invalid for "'duress, illegality, fraud, or mutual mistake.'" Id. (quoting Mangini, 249 N.E.2d at 390). Nor could they argue that it was invalid for fraud considering the only fraud plaintiffs identify, namely, the Glick family allegedly misleading Richard into selling his interest in the Property LLC, is not "a separate fraud from the subject of the [R]elease." Id.

Instead, plaintiffs argue that Richard was unable to release his alleged fiduciaries from his claims because he was not sophisticated and completely trusted them. To support these assertions, plaintiffs highlight that Richard is a retired

---

[2] Plaintiffs argue that whether the Release applies to Alvin and Jason is "a fact question" because "it is unclear whether either of them is a director, agent[,] or employee of" the Buyout LLC. Opp. at 25 n.16. Plaintiffs forget that their complaint alleges that the Glick family, including Alvin and Jason, "owned and controlled" the Buyout LLC, and were thus affiliates of it. FAC ¶ 78. Plainly, then, Alvin and Jason are within the scope of the Release.

physician who inherited his family's real estate holdings and did not participate in the day-to-day operations of the Property LLC. They also cite Richard's statement in his July 26, 2016 email to Randy that "ever since John died 25 years ago, the Mautner family has always put their FULL trust and confidence in the Glick family's management of our share of the real estate holdings," and "[w]e have never questioned any decision you made on our behalf – believing that you have had the Mautner family interest fully at heart . . . ." Gormally Decl., Ex. A.

Contrary to plaintiffs' effort to portray Richard as too inexperienced to release his claims, he was the decades-long owner of significant and lucrative real estate holdings. Moreover, Alan Hammer – a real estate attorney "who ha[d] extensive experience both in NY and NJ" – represented him and "sp[oke] completely on [his] behalf" throughout the buyout negotiations. Lifshitz Decl., Ex. 1; see, e.g., Granite Partners, L.P. v. Bear, Sterns & Co., 17 F.Supp. 2d 275, 291 (S.D.N.Y. 1998) (imputing sophistication of adviser to plaintiff investor).

Moreover, the complete July 26 email – not plaintiffs' cherry-picked quote – plainly demonstrates that Richard had anything but "unquestioning trust" in the Glick family as of that date. Centro II, 952 N.E.2d at 1001. Indeed, in the email, Richard complained that although Randy "had assured [him] that the [Property LLC's]

14

monthly [profit distributions] would be decreased as the tenants were terminated," he had nonetheless "received a letter from Ken Kandel . . . stating that all monthly distributions from the BLOCK w[ould] be stopped . . ." Gormally Decl., Ex. A. Surprised, Richard demanded that Randy "furnish a schedule of all current leases with rental amounts and terms of each lease" so that he could "understand why [Randy] need[ed] to accumulate such a large amount of cash without having yet come to an agreement with Richard." Id. The email then stated the language plaintiffs quote, but it ended with "[w]e hope to be able to continue a partnership with the same confidence and trust." Id. (emphasis added). Such hope belies the trust described in plaintiffs' chosen quote.

In any event, the question is not whether Richard trusted the Glick family on July 26, 2016, but instead whether he did "at the time of the release," Pappas, 982 N.E.2d at 579, and any assertion that he did would flout the precept that "[w]here a principal and fiduciary are sophisticated parties engaged in negotiations to terminate their relationship, the principal cannot blindly trust the fiduciary's assertions," Centro II, 952 N.E.2d at 1002. Accordingly, the Release bars plaintiffs' common law claims.

## C. Plaintiffs' Securities Fraud Claim

Under Section 10(b) of the Exchange Act, it is illegal "[t]o use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j. Pursuant to this rulemaking authority, the SEC promulgated Rule 10b-5, which makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). Thus, to a plead a claim under Section 10(b) and Rule 10b-5, plaintiffs must plead that Richard's membership interests in the Property LLC were securities. Defendants contend that plaintiffs have failed to do so.

Whether a membership interest in an LLC is a security for purposes of Section 10(b) and Rule 10b-5 depends on whether it is an "investment contract." See U.S. v. Leonard, 529 F.3d 83, 87-88 (2d Cir. 2008). An "investment contract" is a contract where

"'[1] a person invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party[.]'" Id. at 88 (quoting SEC v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946)). The parties agree that Richard's membership interests in the Property LLC satisfy the first two elements of this test. They contest, however, whether his membership interests satisfy the third element.

When addressing the third element of the Howey test, "the word 'solely' should not be construed as a literal limitation; rather, [courts] 'consider whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money[,] and the promoter's contribution in a meaningful way.'" Leonard, 529 F.3d at 88 (quoting SEC v. Aqua-Sonic Prods. Corp., 687 F.2d 577, 582 (2d Cir. 1982)). Accordingly, courts "distinguish[] between companies that seek the 'passive investor' and situations where there is a 'reasonable expectation . . . of significant investor control.'" Id. (quoting Aqua-Sonic Prods. Corp., 687 F.2d at 585). "It is the passive investor 'for whose benefit the securities laws were enacted'; where there is a reasonable expectation of significant investor control, 'the protection of the 1933 and 1934 Acts would be unnecessary.'" Id. (quoting Aqua-Sonic Prods. Corp., 687 F.2d at 585). "'The question

is whether an investor, as a result of the investment agreement itself or the factual circumstances that surround it, is left unable to exercise meaningful control over his investment.'" Id. at 91 (emphasis deleted) (quoting Robinson v. Glynn, 349 F.3d 166, 170 (4th Cir. 2003)).

Plaintiffs argue that the provisions of the Operating Agreement that governed the Managing Member's authority deprived Richard of the ability to exercise any control over his investment. Specifically, they note the clauses in Article 7, which provide that "[e]xcept as otherwise provided in the Agreement, the management of the Company and all decisions concerning the business affairs of [it] shall be made by the Managing Member," OA § 7.1, that "the Managing Member . . . shall have the authority to bind," and "to do all things necessary or convenient to carry out the business and affairs of the Company," OA § 7.3, that "[n]o [p]erson dealing with the Company shall have any obligation to inquire into the power or authority of the Managing Member acting on behalf of the [it]," OA § 7.4, and that "[t]he Managing Member shall not have a right to resign and may not be removed by the Members other than for fraud, misfeasance[,] or breach of the Managing Member's standard of care as described in Section 7.6," OA § 7.7.

Plaintiffs omit, however, that these provisions were "[s]ubject to Section 6.1," which afforded members significant

control rights that empowered them to materially curtail the Managing Member's authority. OA § 7.3; <u>see also</u> OA § 7.1 (granting authority to Managing Member "[e]xcept as otherwise provided in the Agreement"). Indeed, Section 6.1 "require[d] the consent of all of the Members" for, among other things, "any amendment to the [Operating] Agreement or to the Articles," OA § 6.1(a), "the sale of Company Property other than in the ordinary course," OA § 6.1(b), "the merger or consolidation of the [Property LLC]," OA § 6.1(c), "the continuation of the Company after a Dissolution event," OA § 6.1(d), "the borrowing of funds or the pledging, mortgaging[,] or otherwise encumbering of any Company Property [with no exception listed for borrowing in the ordinary course of business]," OA § 6.1(e), "the admission of a new Member," OA § 6.1(f), and "the payment of compensation to the Managing Member(s)," OA 6.1(g).

Accordingly, while the Operating Agreement entitled Alvin to direct the Property LLC's daily administration and operations, it afforded Richard, as the owner of half of the business, veto power over an expansive range of material decisions. Such veto power "is antithetical to the notion of member passivity" required to find an investment contract under the federal securities laws. <u>Keith v. Black Diamond Advisors, Inc.</u>, 48 F.Supp. 2d 326, 333 (S.D.N.Y. 1999); <u>see also, e.g.</u>, <u>Endico v. Fonte</u>, 485 F.Supp. 2d

411, 415 (S.D.N.Y. 2007) (deeming "contractual veto power over the sale or encumbrance of [the LLC's] assets" to be "irreconcilable with [the plaintiff's] contention that he was a passive investor in any relevant sense.").

Moreover, Richard leveraged this veto power in his favor. When the Glick family first sought Richard's approval to develop the Block, he objected, and instead expressed his preference to sell the Block. While he eventually agreed to "cooperate" with the development, he did so only after further discussions with the Glick family. After Related and Northwell withdrew from the transaction, he again opposed developing the Block, which opposition led the Glick family to commence negotiations to purchase his interest in the Property LLC in order to pursue the development project. Thus, not only does this entire dispute stem from Richard's veto rights, but also the amended complaint casts Richard as an active investor who was informed about, and weighed in with his views on, plans to develop the Property and the ongoing negotiations to do so.

The Operating Agreement afforded Richard more than just veto rights. It also required the Managing Member to "provide reports, including a balance sheet, statement of profit and loss and changes in Members' accounts, and a statement of cash flows at least annually to the Members," OA § 4.2, and to distribute the Property

LLC's profits annually, OA § 9.2. Furthermore, it permitted Richard to trigger unilaterally the dissolution of the Property LLC through dissociating from it, in which case the Managing Member would be required to compensate Richard for his membership interests. OA §§ 12.1, 13.1, 13.3.

The totality of Richard's authority under the Operating Agreement therefore far exceeded what courts regularly deem sufficient to negate a finding of investor passivity. See, e.g., Nelson v. Stahl, 173 F.Supp. 2d 153, 166 (S.D.N.Y. 2001) (finding LLC agreement gave rise to reasonable expectation of investor control where each member could "audit, examine[,] and make copies of or extracts from the books of account of the Company, Certificate of Formation, minutes of any meeting, tax returns, and other information regarding the affairs of the Company." (internal quotation marks omitted)); Rossi v. Quarmley, 604 Fed. App'x 171, 174 (3d Cir. 2015) (finding the same where the LLC agreement enabled members "to call special meetings with the agreement of one other member, examine [the LLC's] financial documents, and vote in proportion to his share," and "acts of [the LLC] require[d] a vote by a majority of the members." (internal quotation marks omitted)); Great Lakes Chemical Corp. v. Monsanto Co., 96 F.Supp. 2d 376, 392 (D. Del. 2000) (finding the same where the LLC agreement allowed members to dissolve the LLC and fire managers

notwithstanding its provision that "the Members shall not have any authority, right[,] or power to bind the Company, or to manage or control, or to participate in the management or control of, the business and affairs of the Company in any manner whatsoever.").

Confronting all of this, plaintiffs protest that Richard did not actually exercise his control rights under the Operating Agreement, and that, as a physician living in Georgia instead of New York City, he was too unsophisticated to assert his rights. But it is the member's objective ability to exercise control, not the formal exercise of control, that governs the inquiry. Leonard, 529 F.3d at 91; see also, e.g., Ave. Capital Mgmt. II, L.P. v. Schaden, 843 F.3d 876, 884 (10th Cir. 2016) ("analyz[ing] the measure of control that [members] could exercise" because "the test of control is an objective one." (emphasis added and internal quotation marks omitted)); Wen v. Willis, 117 F.Supp. 3d 673, 685 (E.D. Pa. 2015) ("This issue 'does not turn on whether the investor actually exercised its rights,' but rather on 'what legal rights and powers were enjoyed by the investor.'" (quoting Steinhardt Grp., Inc. v. Citicorp, 126 F.3d 144, 150 (3d Cir. 1997))). Moreover, in asserting Richard's claimed lack of expertise, plaintiffs ignore yet again his expansive portfolio of lucrative real estate holdings, his decades of experience investing in real estate, and his retention of expert assistance when he deemed such

assistance advantageous.  See Robinson, 349 F.3d at 171 (rejecting argument that plaintiff's "lack of technological expertise relative to [his co-member] prevented him from meaningfully exercising his rights" because "[t]o the extent that [plaintiff] needed assistance in understanding any particular aspect of [the] technology, nothing prevented him from seeking it from outside parties").

Accordingly, Richard's membership interests in the Property LLC were not "investment contracts," and were therefore not securities.[3]  The Court accordingly dismisses plaintiffs' claim under Section 10(b) and Rule 10b-5 promulgated thereunder.

**D. Leave to Amend**

Plaintiffs request leave to amend their complaint in a footnote in their opposition brief.  Opp. at 25 n.17.  They state that the amendments would "include (1) the names of individuals who were present at the time of the alleged misrepresentations, (2) the location of certain meetings between the parties, and (3) the approximate dates of those meetings and related telephone calls."  Id.  The Court denies plaintiffs' request as futile because the proposed amendments could not alter the Court's

---

[3] Plaintiffs concede that Section 11.1 of the Operating Agreement, which states only that members cannot transfer their interests "except upon compliance with the applicable federal and state securities laws," does not itself apply the federal securities laws to the membership interests.  OA § 11.1 (emphasis added).  The Court agrees.

conclusions that the Release bars plaintiffs' common law claims and that Richard's membership interests in the Property LLC were not securities. See Dluhos v. Floating & Abandoned Vessel, Known as "New York", 162 F.3d 63, 69 (2d Cir. 1998) (explaining that courts may deny leave to amend for "futility of amendment" (quoting Foman v. Davis, 371 U.S. 178, 182 (1962))); Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 119 (2d Cir. 2012) ("Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) . . . .").

### III. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss and dismisses plaintiffs' amended complaint with prejudice. The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 30, 31, and 36, and to close the case.[4]

**SO ORDERED.**

Dated:     New York, New York
           November 25, 2019

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[4] Defendants requested oral argument pursuant to the Court's Individual Practices § 2.H. Given the legal bases on which the Court has decided this motion, and given that the Court has found in favor of the only party that requested oral argument, the Court declines to hear oral argument on this motion.